**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

| | |
|---|---|
| Larry Fackler, Edward Hobbs, and Stephen Hager, *on behalf of themselves and all others similarly situated*,<br><br>              Plaintiffs,<br><br>v.<br><br>Nucor Corporation<br>SERVE:<br>       C T Corporation System<br>       306 W. Main St. Suite 512<br>       Frankfort, KY 40601<br><br>and<br><br>Greenland Acquisition Company, Inc.<br>1915 Rexford Road<br>Charlotte, North Carolina 28211<br>SERVE:<br>       Kentucky Secretary of State<br>       700 Capital Ave., Ste. 152<br>       Frankfort, KY 40601<br><br>              Defendants. | Case No. <u>3:20-CV-539-DJH</u><br><br><br>**CLASS ACTION COMPLAINT**<br>**AND DEMAND FOR JURY TRIAL** |

## I.    INTRODUCTION

Plaintiffs Larry Fackler, Edward Hobbs, and Stephen Hager bring this class action on behalf of themselves and other similarly situated individuals ("the Class") against Defendants Nucor Corporation and Greenland Acquisition Company, Inc., arising out of a conspiracy to eliminate the grain facility at the Meade County Riverport so that Nucor could build a steel mill in its place. The loss of the grain facility has caused financial damage to the Class members, who relied on the grain facility to conduct their farming operations. The Plaintiffs seek compensation on behalf of themselves and all others similarly situated.

## II.    PARTIES AND JURISDICTION

1.       Plaintiff Larry Fackler is a citizen and resident of the Commonwealth of Kentucky. At all relevant times, Plaintiff engaged in the business of grain farming, contracted for grain sales at the grain facility at the Meade County Riverport, and had a prospective contractual interest and enforceable legal expectancy in future grain sales at the grain facility. Fackler resides at 660 Woodland Road, Vine Grove, Kentucky 40175.

2.       Plaintiff Edward Hobbs is a citizen and resident of the Commonwealth of Kentucky. At all relevant times, Plaintiff engaged in the business of grain farming, contracted for grain sales at the grain facility at the Meade County Riverport, and had a prospective contractual interest and enforceable legal expectancy in future grain sales at the grain facility. Hobbs resides at 3940 St. Martin Road, Vine Grove, Kentucky 40175.

3.       Plaintiff Stephen Hager is a citizen and resident of the Commonwealth of Kentucky. At all relevant times, Plaintiff engaged in the business of grain farming, contracted for grain sales at the grain facility at the Meade County Riverport, and had a prospective contractual interest and enforceable legal expectancy in future grain sales at the grain facility. Hager resides at 3196 Big Springs Road, Vine Grove, Kentucky 40175.

4.       The Class consists of people who are or have been engaged in the business of grain farming, contracted for grain sales at the grain facility at the Meade County Riverport, and had a prospective contractual interest and enforceable legal expectancy in future grain sales at the grain facility.

5.       On information and belief, the number of members of all proposed plaintiffs in the aggregate including Plaintiffs and the Class is substantially in excess of 100. The claims of the Class members, aggregated together, exceed $5,000,000.00, exclusive of interest and costs.

6.       Defendant Nucor Corporation is a Delaware corporation with its principal place of business in Charlotte, North Carolina, and is authorized to transact business in the Commonwealth of Kentucky.

7.      Defendant Greenland Acquisition Company, Inc., is a Delaware corporation with its principal office in Charlotte, North Carolina, and, on information and belief, is a wholly-owned subsidiary of Nucor.  Nucor Corporation and Greenland Acquisition Company, Inc. are referred to collectively hereafter as "Nucor" or "Defendants."

8.      At all material times, Defendants were and are legally responsible for all the unlawful conduct, acts, and omissions as described and set forth in this Complaint.

9.      This Court is vested with jurisdiction pursuant to 28 U.S.C. §1332. Plaintiffs are citizens of Kentucky, and Defendants are citizens of Delaware and North Carolina. Further, the number of members of all proposed plaintiffs in the aggregate including Plaintiffs and the Class is at least 100, and the claims of the Class members, aggregated together, exceed $5,000,000.00, exclusive of interest and costs.

10.     Venue is proper pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to the claims herein occurred in this district.

### III.     FACTUAL ALLEGATIONS

**The Meade County Grain Facility**

11.     In the grain farming industry, farmers typically bring their product to market by contracting for sale and delivery to a grain facility operated by a grain processing company. Many grain facilities are located at riverports, so that the grain delivered there by farmers can be loaded onto barges for transport and further distribution downriver.

12.     Farmers deliver their grain to grain facilities by semi-trailer trucks, incurring transportation costs. The greater the distance that the farmer must travel to a grain facility, the greater the associated transportation costs. Because of this, farmers typically sell their grain to the nearest grain facility.

13.     In 2014, Consolidated Grain & Barge Co. ("CGB") built and began operating a grain facility at the Meade County Riverport (hereafter, "the Grain Facility"), pursuant to a lease with the Meade County Riverport Authority ("the Lease"). Additional parties to the

Lease included the Meade County Fiscal Court ("Fiscal Court") and the Meade County – Brandenburg Industrial Development Authority ("Development Authority"). (See Lease attached hereto as Exhibits 2-3.[1]) The sole purpose of the Lease, by its terms, was for CGB to operate a grain facility in Brandenburg.

14.     The Term of the Lease was 10 years from the completion of the Grain Facility in 2014, followed by two optional renewal periods of five years each. Thus, per its terms, the Lease would have been in place at minimum through 2024, and likely through 2034.

15.     At all relevant times, Plaintiffs and the Class sold and delivered grain to CGB at the Grain Facility. An example of a contract for sale of grain to the Grain Facility is attached hereto as Exhibit 1. Plaintiffs and the Class contracted with CGB for all or nearly all of their grain sales and intended and expected to continue selling all or nearly all of their grain to CGB at the Grain Facility for the remaining term of the Lease. So long as the Lease remained effective, CGB would have operated the Grain Facility in Brandenburg, and the Class would have sold and delivered grain to the Grain Facility.

16.     Each of the Plaintiffs and the Class had a prospective contractual interest and enforceable legal expectancy in future grain sales at the Grain Facility.

**Nucor Intentionally Causes the Termination of the CGB Lease**

17.     In March 2019, public officials in Meade County announced that Nucor planned to build a steel mill at the Meade County Riverport. Often, public riverports are occupied by multiple different types of large business operations. Local officials made public and private assurances that the Grain Facility either would remain at the Riverport or would be moved to a nearby spot in Meade County with no disruption of service to the farmers.

---

[1] Exhibit 2 is the original Lease of September 7, 2010.  Exhibit 3 is a Settlement Agreement in certain litigation which had the effect of amending the Lease in certain respects.

18.     Secretly, however, certain public officials, Nucor, and CGB negotiated in August and September 2019 to terminate CGB's Lease and destroy the Grain Facility so that Nucor could occupy the entire Riverport. Specifically, Nucor offered to pay CGB $12 million to terminate the Lease and destroy the Grain Facility by March 31, 2020, followed by another $8 million in 2022 if CGB had not built another grain facility nearby. Nucor drafted a contract ("the Lease Termination Agreement") memorializing these terms. At the time of these negotiations, Nucor knew and understood that the Class members had existing and prospective contractual relationships with CGB because of the Lease, and that terminating the Lease would destroy the Class members' prospective contractual relationships.

19.     Nucor's $20 million offer to terminate the Lease was an offer CGB couldn't refuse. On information and belief, it exceeded the economic benefit of the Lease – the profit CGB made from contracting with farmers for grain sales – as well as any potential exposure CGB would face by breaching the Lease or its contracts with farmers, thus totally destroying CGB's freedom of contract under the Lease and with the Class members. When the heads of Fiscal Court and Development Authority learned of the amount of the offer, they commented that CGB would not return to Meade County.

20.     In order to accomplish the transaction as quickly as Nucor wished, Nucor and the public officials wanted all parties to the Lease to mutually agree to its termination. Privately, the Fiscal Court, Development Authority, and CGB assured Nucor that they would sign the Lease Termination Agreement. This left only the Riverport Authority.

21.     By September 2019, no member of the Riverport Authority had been informed of the potential Lease Termination Agreement. The other parties had kept the terms secret from the Riverport Authority because they knew the Riverport Authority members would not likely approve of termination of the Lease, due to the damage it would cause to farmers. Certain other public officials were willing to overlook that damage because they believed the overall economic benefits of bringing a steel mill to the Riverport

outweighed the economic benefits of having a grain elevator there. This "ends justifies the means" mentality ultimately led them to take illegal measures to terminate CGB's Lease.

22.     At a meeting on September 24 involving the heads of the Fiscal Court, Development Authority, and board members of the Riverport Authority, the proposed Lease Termination Agreement was presented to the Riverport Authority. The majority of the Riverport Authority members rejected the Lease Termination Agreement because of concerns about the damage it would cause to farmers.

23.     After rejection by the Riverport Authority, Nucor and local officials scrambled to find a way to terminate the Lease quickly enough to accommodate Nucor's timetable for construction of the steel mill. In the days following the September 24 meeting, Nucor pressured the Fiscal Court and Development Authority to make the Riverport Authority sign the Lease Termination Agreement by October 1. In an email of September 27, Nucor representative Johnny Jacobs told the county officials that Nucor needed "results" and stressed that the Lease Termination Agreement must be "fully resolved by end of day Tuesday [October 1] at latest."

24.     Because of Nucor's urging, the Fiscal Court and Development Authority conceived a plot to remove two of the objecting Riverport Authority members – Nicholas Hardesty and Don Bewley – from the Riverport Authority and replace them with two new members who had been pre-selected to vote in favor of the Lease Termination Agreement. Fiscal Court leader Gerry Lynn located two people, Brian Claycomb and Bill Corum, willing to do so.

25.     Nucor was aware of and approved the plan to replace Hardesty and Bewley. On the afternoon of October 1, Nucor had a phone call with leaders of the Fiscal Court and Development Authority in which, on information and belief, they discussed the plan to secure the vote that night. Also on the afternoon of October 1, Nucor attorneys exchanged email correspondence with leaders of the Fiscal Court and Development Authority in which Development Authority head David Pace assured the Nucor attorneys that county officials

had arranged for the Riverport Authority to vote for the Lease Termination Agreement later that evening, stating, "We will have it resolved tonight and signed off on by both parties tomorrow." In a text message that day, Pace told Nucor's local manager Johnny Jacobs, "we have our plan ready," to which Jacobs responded, "Good to hear." Because Jacobs knew that the outcome of the Riverport Authority vote had been predetermined, he asked them to text him after the meeting "to confirmed [sic] all is approved on CGB."

26.     Because of the public uproar it would cause, none of the conspirators wanted the Riverport Authority or the public to know about the plan to replace Hardesty and Bewley ahead of time. The Fiscal Court called a "special meeting" for October 1, but intentionally failed to provide an adequate agenda under the Kentucky Open Meetings Act. The first item on the published meeting agenda stated, simply, "Riverport," giving no notice to the public that the purpose of the special meeting was to replace Riverport Authority board members.

27.     At the meeting, the Fiscal Court replaced Hardesty and Bewley with Corum and Claycomb, purportedly on the basis that Hardesty's and Bewley's terms had expired. The replacement was blatantly illegal because Hardesty's and Bewley's terms had not expired. Moreover, under the Fiscal Court's reasoning for claiming that the terms of Hardesty and Bewley had expired (had that reasoning been correct), the terms of *all* members of the Riverport Authority would have been expired. In that case, the Fiscal Court would have had absolutely no rational or lawful basis for selectively replacing just two members. Thus, the Fiscal Court's action was: (1) illegal on its face; and (2) arbitrary and without rational basis.

28.     Immediately following the special meeting, the illegally constituted Riverport Authority attempted to convene a meeting. However, because only three "members" attended (Corum, Claycomb, and Brandon Fogle), they lacked the statutory quorum necessary for the Riverport Authority to do business under KRS 65.560. Thus their

unanimous vote at that meeting to approve the Lease Termination Agreement had no legal effect.

29.     Local media reported on the events of the October 1 meeting, generating a public outcry in Meade County regarding the potential destruction of the Grain Facility. On information and belief, Nucor knew and understood that the purported agreement of the Riverport Authority to terminate the Lease was obtained through improper, unjustified, and unlawful acts, each of which was a substantial factor in causing damage to the Plaintiffs and the Class, including but not limited to:

> (1)     Nucor using extreme economic pressure to coerce CGB to terminate its Lease with knowledge that this would destroy the prospective contractual relations of the Class;
>
> (2)     At Nucor's behest, the Fiscal Court plotting to stack the Riverport Authority with political favorites in order to terminate the Lease;
>
> (3)     The Fiscal Court calling an illegal special meeting in violation of the Open Meetings Act for the purpose of replacing the Riverport Authority members without public scrutiny;
>
> (4)     The Fiscal Court purporting to replace Riverport Authority members whose terms had not expired, and with no rational or lawful basis;
>
> (5)     The Riverport Authority purporting to authorize the Lease Termination Agreement without a lawful quorum.

30.     On December 13, with knowledge that these improper, unjustified, and unlawful acts would cause damage to the Class, Nucor and the Fiscal Court executed the Lease Termination Agreement which had already been executed by the other parties thereto.   (See Exh. 4, Lease Termination Agreement; Exh. 5, Acknowledgement and Agreement to CGB Lease Termination Agreement.)

**Meade Circuit Court litigation**

31.     In January 2020, a lawsuit was filed in Meade Circuit Court styled *Lincoln Trail Grain Growers Association, Inc., et al. v. Meade County Fiscal Court, et al.*, Case No. 20-CI-00001 ("the Meade County Action") by a nonprofit organization and certain individual farmers, seeking, among other things, an injunction to stop the destruction of the Grain Facility on the grounds that the Lease Termination Agreement was void. The plaintiffs in the Meade County Action did not assert claims for monetary damage against Nucor. The named Plaintiffs in this action were not plaintiffs in the Meade County Action.

32.     In that case, the Circuit Court dismissed the action for lack of standing. The plaintiffs in that case have appealed that ruling to the Kentucky Court of Appeals.

33.     Without any injunction in place, CGB ceased operation of the Grain Facility and terminated all contractual relationships with the Class as of February 1, 2020. CGB proceeded in February to begin destroying portions of the Grain Facility pursuant to the Lease Termination Agreement. On information and belief, Nucor has paid CGB the $12 million initial payment for destroying the Grain Facility. Presently, the Grain Facility is inoperable because portions of it have been destroyed. Nucor plans to destroy the access road to the Grain Facility as well but has not yet done so.

34.     Regardless of the outcome of the Meade County Action, Plaintiffs and the Class have suffered and will continue to suffer substantial monetary damage. Even if the plaintiffs in the Meade County Action ultimately are successful in obtaining declaratory and injunctive relief, the Class has suffered and will continue to suffer monetary damage because the Grain Facility has been rendered inoperable since February 1 as a result of which the prospective contractual relationships between CGB and the Class have been terminated and destroyed. The termination of CGB's prospective contractual relationships with the Class was

the foreseeable, direct, and intended result of Nucor's intentional interference with those relationships.

**Monetary Damage of the Class**

35.     Plaintiffs now bring this action to recover for the monetary damage Plaintiffs and the Class have suffered as a result of Nucor's wrongful conduct.

36.     Because of the Lease Termination Agreement and resulting destruction of the Grain Facility, Plaintiffs and the Class have lost their prospective contractual relationships with CGB. As a result, Plaintiffs and the Class have incurred and will continue incurring substantial increased costs as a result of contracting for delivery of grain to grain facilities farther away than the Meade County Grain Facility. These damages can and will be calculated and proven to a reasonable certainty. The same method of calculating damage applies to each of the Plaintiffs and the Class.

## IV.    CLASS ACTION ALLEGATIONS

37.     Plaintiffs bring this action as a class action on behalf of themselves and all others similarly situated pursuant to Federal Rule of Civil Procedure 23. The Class that Plaintiffs seek to represent is defined as follows:

> All persons or entities: (1) who contracted for sale of grain to CGB at the Grain Facility in Meade County; and (2) whose farming operations are located nearer to the Grain Facility in Meade County than any other grain facility.

38.     This action has been brought and may properly be maintained as a class action because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable.

39.     The potential members of the Class as defined are so numerous that joinder of all the members of the Class is impracticable. Plaintiffs are informed and believe that the

number of class members substantially exceeds 100. This volume makes bringing the claims of each individual member of the Class before this Court impracticable. Likewise, joining each individual member of the Class as a plaintiff in this action is impracticable. Furthermore, the identities of the members of the Class will be readily determined, such as by discovery of business records of CGB relating to the Grain Facility. As such, a class action is a reasonable and practical means of resolving these claims. To require individual actions would prejudice the Class and defendants.

40.     There are questions of law and fact common to Plaintiffs and the Class that predominate over any questions affecting only individual members of the Class. These common questions of law and fact include, but are not limited to:

(a)     Whether Plaintiffs and the Class had a prospective contractual interest and legitimate economic expectancy in contracting for sale of grain to CGB;

(b)     Whether Nucor intentionally interfered with that prospective contractual interest and legitimate economic expectancy;

(c)     Whether Nucor's conduct was improper;

(d)     Where Plaintiffs and the Class suffered damage as a result of Nucor's conduct;

(e)     The appropriate measure of calculating damages owed to Plaintiffs and the Class as alleged herein; and

(f)     Whether Nucor's actions were willful, wanton, and malicious.

41.     Plaintiffs' claims are typical of the claims of the Class. Nucor's common course of conduct in violation of law as alleged herein has caused Plaintiffs and proposed Class members to sustain the same or similar injuries and damages. Plaintiffs' claims are thereby representative of and co-extensive with the claims of the Class.

42.     Plaintiffs are members of the Class, do not have any conflicts of interest with other proposed Class members, and will prosecute the case vigorously on behalf of the

Class. Counsel representing Plaintiffs is competent and experienced in litigating complex cases and class actions. Plaintiffs will fairly and adequately represent and protect the interests of the Class members.

43.     A class action is superior to other available means for the fair and efficient adjudication of this dispute. Individual joinder of all proposed Class members is impracticable, and questions of law and fact common to the Class predominate over any questions affecting only individual Class members. Each proposed Class member has been damaged and is entitled to recovery by reason of Nucor's unlawful conduct. Class action treatment will allow those similarly situated persons to litigate their claims in the manner that is most efficient and economical for the parties and the judiciary.

44.     In the alternative, the Class may be certified because the prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual members of the Class which would establish incompatible standards of conduct for Nucor.

45.     If each individual Class member were required to file an individual lawsuit, Nucor would necessarily gain an unconscionable advantage because Nucor would be able to exploit and overwhelm the limited resources of each member of the Class with Nucor's superior resources.

## V.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Intentional Interference with Prospective Contractual and Business Relations**

46.     Plaintiffs reallege and incorporate the above paragraphs as though fully set forth herein.

47.     The Plaintiffs and the Class had a valid contractual and business relationship and expectancy with CGB.

48.     Nucor was aware of this relationship and expectancy.

49.     Nucor intentionally interfered with this relationship and expectancy.

50.     Nucor lacked justification for interference and interfered in a manner that was improper and significantly wrongful.

51.     Nucor's conduct caused the loss of the relationship and expectancy.

52.     Nucor's conduct caused special damages.

53.     Nucor's actions were willful, wanton, and malicious.

54.     Plaintiffs and the Class are entitled to recover damages.

## SECOND CAUSE OF ACTION
### Civil Conspiracy

55.     Plaintiffs reallege and incorporate the above paragraphs as though fully set forth herein.

56.     Nucor engaged in concerted action with the Fiscal Court, Development Authority, and CGB, in the commission of torts and other legal wrongs against Plaintiffs and the Class, including but not limited to tortious interference with prospective contractual and business relations, violation of the Open Meetings Act, and arbitrary action in violation of Section 2 of the Kentucky Constitution.

57.     Plaintiffs and the Class suffered damage as a result of those concerted actions.

58.     Nucor's actions were willful, wanton, and malicious.

59.     Plaintiffs and the Class are entitled to recover damages.

## VI.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class they seek to represent in this action, request the following relief:

1.      An order certifying this case as a class action, appointing Plaintiffs as the representatives of the Class, and appointing Plaintiffs' attorneys as Class Counsel;

2.      An order awarding Plaintiffs and the Class compensatory damages;

3.      An order awarding Plaintiffs and the Class punitive damages;

4.      Pre-judgment and post-judgment interest, as provided by law;

5.      All costs of suit;

6.      A trial by jury; and

7.      Any other and further relief the Court deems just and proper.

Dated: July 31, 2020                              Respectfully Submitted,

                                                  /s/ Michael C. Merrick
                                                  CLARK C. JOHNSON
                                                  MICHAEL C. MERRICK
                                                  KAPLAN JOHNSON ABATE & BIRD LLP
                                                  710 West Main Street, Fourth Floor
                                                  Louisville, Kentucky 40202
                                                  Telephone: (502) 416-1630
                                                  Facsimile: (502) 540-8282
                                                  cjohnson@kaplanjohnsonlaw.com
                                                  mmerrick@kaplanjohnsonlaw.com
                                                  *Counsel for Plaintiffs*