# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  June 28, 2022

Mr. Douglas C. Ballantine
Mr. Christopher E. Schaefer
Stoll Keenon Ogden
500 W. Jefferson Street
Suite 2000
Louisville, KY 40202

Mr. Michael Charles Merrick
Mr. Burt Anthony Stinson
Kaplan, Johnson, Abate & Bird
710 W. Main Street
Suite 400
Louisville, KY 40202

> Re:  Case No. 21-5989, *Larry Fackler, et al v. Greenland Acquisition Co., et al*
> Originating Case No. : 3:20-cv-00539

Dear Counsel,

The Court issued the enclosed opinion today in this case.

Enclosed are the court's unpublished opinion and judgment, entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Sincerely yours,

s/Cathryn Lovely
Opinions Deputy

cc:  Mr. James J. Vilt Jr.

Enclosures

Mandate to issue

NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0258n.06

No. 21-5989

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| LARRY FACKLER, EDWARD HOBBS, and STEPHEN HAGER, on behalf of themselves and all others similarly situated, | ) ) ) | |
| Plaintiffs-Appellants, | ) | **FILED** Jun 28, 2022 DEBORAH S. HUNT, Clerk |
| v. | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF KENTUCKY |
| GREENLAND ACQUISITION CO., INC.; NUCOR CORPORATION, | ) ) | |
| Defendants-Appellees. | ) ) | OPINION |

Before: BATCHELDER, CLAY, and LARSEN, Circuit Judges.

LARSEN, J., delivered the opinion of the court in which BATCHELDER, J., joined. CLAY, J. (pp. 15–20), delivered a separate dissenting opinion.

LARSEN, Circuit Judge. Local farmers near Brandenburg, Kentucky used to sell their crops to Consolidated Grain & Barge Co., the operator of a nearby grain elevator. But the land on which the elevator sat was quite valuable—so valuable that Nucor Corporation offered Consolidated millions to destroy the elevator so that Nucor could build a steel mill in its place. Consolidated stood to make more by accepting Nucor's offer than by reselling local grain, so Consolidated agreed. Political gamesmanship ensued as Nucor and Consolidated urged local authorities to consummate the deal. In the end, the deal went through; as a result, the farmers lost the prospect of future sales to Consolidated. The farmers sued Nucor for intentional interference with prospective economic advantage and civil conspiracy. The district court dismissed both counts for failure to state a claim. We AFFIRM.

No. 21-5989, *Fackler v. Greenland Acquisition Co.*

## I.

We take the following allegations from the farmers' complaint as true.  *Bose v. Bea*, 947 F.3d 983, 994 (6th Cir. 2020).

In 2014, Consolidated built and began operating a grain elevator on part of the Meade County Riverport, and local grain farmers started selling their crops to Consolidated.  Consolidated leased the land from the Meade County Riverport Authority, and for reasons not relevant here, the Meade County Fiscal Court and the Meade County – Brandenburg Industrial Development Authority were additional parties to the lease.  The initial lease term would have expired in 2024, with two 5-year optional renewal periods to follow.

In March 2019, local officials announced that Nucor planned to build a steel mill at the Riverport, though they assured the community that the grain elevator would continue operating.  Behind the scenes, however, Nucor, Consolidated, and certain public officials "[s]ecretly" negotiated to terminate Consolidated's lease and destroy the grain elevator so that Nucor could occupy the entire Riverport.  Nucor offered to pay Consolidated $12 million for the initial lease termination and facility destruction, with another $8 million to follow in 2022 if Consolidated had not built another grain facility nearby.  The $20 million offer exceeded Consolidated's expected profit from future grain sales and any potential legal liability for breached contracts.

Nucor wanted to complete the deal quickly, but that required getting all parties to the lease to agree to its early termination.  As of September 2019, members of the Fiscal Court and Development Authority "believed the overall economic benefits" of Nucor's steel mill "outweighed the economic benefits of having a grain elevator there," and thus wanted to move forward with the early termination.  A majority of the Riverport Authority, however, rejected the plan as too damaging to local farmers.  After the rejection, "Nucor and local officials scrambled

No. 21-5989, *Fackler v. Greenland Acquisition Co.*

to find a way to terminate the lease" by Nucor's target date: October 1.  "Because of Nucor's urging, the Fiscal Court and Development Authority conceived of a plot to" replace two of the objecting members of the Riverport Authority with stooges who would approve the termination agreement.[1]  Nucor was "aware of and approved" that plan.

To execute the scheme with minimal "public uproar," the Fiscal Court called a special meeting on October 1.  To evade public scrutiny, the Fiscal Court kept the meeting agenda vague, listing "Riverport"—nothing more—as the first item on the published agenda, in an alleged violation of the Kentucky Open Meetings Act, Ky. Rev. Stat. § 61.823.  And sure enough, at the beginning of the meeting, the Fiscal Court replaced the two dissidents on the pretext that their terms had expired.  At the end of the meeting, three members of the newly constituted Riverport Authority voted, without the required quorum of four, to approve the lease termination.

On December 13, despite knowing that "the purported agreement of the Riverport Authority . . . was obtained through improper, unjustified, and unlawful acts," Nucor, Consolidated, and the local authorities executed the early lease termination.  A local organization of farmers sued in state court to stop the destruction of the grain elevator, but its initial bid for injunctive relief failed.[2]  By February 2020, Consolidated had terminated its existing contracts with the farmers and had begun tearing down the grain facility.

Three local farmers—Larry Fackler, Edward Hobbs, and Stephen Hager—brought this suit against Nucor and its subsidiary, Greenland Acquisition Company, on behalf of a putative class of

---

[1] Kentucky law vests each county's fiscal court with the authority to appoint and replace members of the county riverport authority.  *See* Ky. Rev. Stat. §§ 65.540(1)(b), 67.080(1)(f).

[2] The state trial court dismissed the suit for lack of standing, but the Kentucky Court of Appeals reversed that ruling.  *Lincoln Trail Grain Growers Ass'n v. Meade Cnty. Fiscal Ct.*, 632 S.W.3d 766, 768 (Ky. Ct. App. 2021).

-3-

No. 21-5989, *Fackler v. Greenland Acquisition Co.*

all local farmers who sold or expected to sell grain to Consolidated. Invoking the federal court's diversity jurisdiction, the farmers asserted two claims under Kentucky law: intentional interference with prospective economic expectancy and civil conspiracy. Nucor moved to dismiss, arguing, among other things, that the farmers failed to state a claim.

The district court granted Nucor's motion. The court first decided that Nucor's interference was not improper because it was acting out of legitimate economic self-interest and merely approved of—but did not participate in—the local officials' plot to rig the Riverport Authority's vote. Second, the court concluded that the civil-conspiracy claim failed because Nucor neither committed an underlying tort nor provided substantial assistance to the Fiscal Court and Development Authority. The farmers appeal the dismissal of both claims.

II.

We review de novo the district court's grant of a motion to dismiss for failure to state a claim. *Bose*, 947 F.3d at 994. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

A.

An actor may be liable to another for "intentionally and improperly" interfering with his "prospective contractual relation" with a third party. Restatement (Second) of Torts § 766B (Am. L. Inst. 1979); *see NCAA ex rel. Bellarmine Coll. v. Hornung*, 754 S.W.2d 855, 857 (Ky. 1988) (adopting Second Restatement). The parties' dispute here turns on whether Nucor's interference was "improper," a question that Kentucky courts resolve using the Restatement's seven-factor test. *Hornung*, 754 S.W.2d at 858 (citing Restatement (Second) of Torts § 767). The parties' arguments

-4-

No. 21-5989, *Fackler v. Greenland Acquisition Co.*

center on two of those factors: "the actor's motive" and "the nature of the actor's conduct." Restatement (Second) of Torts § 767(a)–(b).

We begin by settling a dispute regarding the import of Nucor's motive. The parties take opposite positions on this score. The farmers argue that "the fact that Nucor was acting in its own economic interest is irrelevant." Nucor, by contrast, says its economic self-interest is dispositive because it belies a finding of "malice," which Nucor believes is an indispensable element. The right answer lies somewhere in the middle.

A defendant's motive is material but not always conclusive. As the Restatement explains:

> If the conduct is independently wrongful—as, for example, if it is illegal because it is in restraint of trade or if it is tortious toward the third person whose conduct is influenced—the desire to interfere with the [plaintiff's] contractual relations may be less essential to a holding that the interference is improper. On the other hand, if the means used by the [defendant] are innocent or less blameworthy, the desire to accomplish the interference may be more essential to a holding that the interference is improper.

*Id.* § 767 cmt. d; *see also United Propane Gas, Inc. v. NGL Energy Partners, LP*, No. 2019-CA-0816-MR, 2020 WL 7295180, at *6 (Ky. Ct. App. Dec. 11, 2020) (unpublished) (explaining that although the defendant acted with a proper purpose, it could "still be held liable" if it "used wrongful means to interfere"). Suppose, for example, Nucor had burned down the grain elevator, forcing Consolidated to sell the land at a rock-bottom price. Even if Nucor's motive was purely economic, rather than malicious, that surely would not have excused its methods.

In short, a pure motive is not the get-out-of-liability-free card that Nucor envisions. None of the authorities it cites say otherwise. Some simply stand for the proposition—consistent with the Restatement—that the absence of malicious intent cuts against a finding of impropriety when there is no evidence of wrongful conduct. *See Hornung*, 754 S.W.2d at 859 (holding plaintiff "must show malice or some significantly wrongful conduct"); *ATC Distrib. Grp., Inc. v. Whatever*

No. 21-5989, *Fackler v. Greenland Acquisition Co.*

*It Takes Transmissions & Parts, Inc.*, 402 F.3d 700, 717 (6th Cir. 2005) ("The district court properly granted summary judgment on this claim in favor of the . . . Defendants, because there is no evidence in the record of either the malice or unjustified conduct required to prove intentional interference."); *see also Excel Energy, Inc. v. Cannelton Sales Co.*, 246 F. App'x 953, 967–68 (6th Cir. 2007) (similar). True, in *Bourbon County Joint Planning Commission v. Simpson*, 799 S.W.2d 42, 45 (Ky. Ct. App. 1990), the court said, without qualification, that to state an intentional interference claim, "malice must be shown, but only in the sense of lack of justification for the interference." But the court also concluded that the defendants were statutorily "entitled" to engage in their means of interference, and thus the plaintiff's burden of showing impropriety was an especially "difficult one." *Id.* at 46. The court had no occasion to consider how wrongful conduct might have lessened that burden.

But neither are Nucor's intentions "irrelevant" as the farmers contend. The farmers do not allege that Nucor desired to cut off their contracts with Consolidated. Rather, to Nucor, the interference was simply "a necessary consequence," Restatement (Second) of Torts § 767 cmt. d, of its plan to build a steel mill at the Riverport. *See also Cullen v. South East Coal Co.*, 685 S.W.2d 187, 190 (Ky. Ct. App. 1983) (finding no improper interference where defendant's conduct, though intended to cut off plaintiff's future contracts, was motivated by its legitimate economic interests). With no evidence of mal-intent, the farmers' tortious-interference claim requires allegations of "some significantly wrongful conduct." *Hornung*, 754 S.W.2d at 859; *see also* Restatement (Second) of Torts § 767 cmt. f (An actor's economic interest "is important and will normally prevail over a similar interest of the other if the actor does not use wrongful means.").

The farmers group their allegations of wrongful conduct into two theories. As we address each, keep in mind that the Restatement gives greater solicitude to existing contracts than

-6-

No. 21-5989, *Fackler v. Greenland Acquisition Co.*

prospective ones.  Restatement (Second) of Torts § 767 cmt. e.  The fact that only prospective contracts are at issue here—along with the absence of bad faith—weighs against deeming Nucor's interference improper.

1.

The farmers' first theory of wrongful conduct is that Nucor paid Consolidated too much. Because the $20 million offer "exceeded the economic benefit" of operating a grain elevator at the Riverport, the farmers contend that Nucor exerted improper pressure on Consolidated.  We disagree.  What the farmers cast as coercion is more conventionally called competition.

Although they produced different goods (grain and steel), the farmers and Nucor were competitors in the sense that both wanted the economic benefit of the Riverport land.  The farmers wanted Consolidated to keep operating at the Riverport site; their "bid" amounted to the profits Consolidated could expect from reselling the farmers' grain.  (They could have upped their "bid" by lowering prices, for example.)  Nucor wanted Consolidated to vacate the Riverport site, so that Nucor could move in, and its bid was $20 million.  The complaint says that Nucor's bid was higher, so Consolidated accepted it.  That's the kind of economic competition that American law not only tolerates, but actively encourages.  *See* Restatement (Second) or Torts § 768 cmt. b; *Excel Energy*, 246 F. App'x at 967–68; *cf. Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 323–24 (2007) (noting that "high bidding is essential to competition").

The farmers insist that Nucor's offer amounted to unfair competition akin to predatory pricing.  Predatory bidding (predatory pricing on the buy side of the market) occurs when a buyer temporarily offers a price for inputs that exceeds its expected return, with the goal of driving out competitors and charging monopolistic prices in the long run.  *Weyerhaeuser*, 549 U.S. at 320–21. Because of its anticompetitive effects, predatory bidding violates the antitrust laws, *id.* at 322, and

-7-

No. 21-5989, *Fackler v. Greenland Acquisition Co.*

accordingly could be deemed improper interference with contractual relations, Restatement (Second) of Torts § 768(1)(c).

But the farmers fall far short of alleging predatory bidding.  First, they never allege that the $20 million offer exceeded *Nucor*'s expected return from running a steel mill.  All they say is that it exceeded *Consolidated*'s expected profit from running a grain elevator.  That's a winning bid, not a predatory one.  *See Weyerhaeuser*, 549 U.S. at 325 ("Given the multitude of procompetitive ends served by higher bidding for inputs . . . only higher bidding that leads to below-cost pricing in the relevant output market will suffice as a basis for liability for predatory bidding.").  Second, the farmers' theory misunderstands the reason for the ban on predatory bidding.  High bids are not themselves a problem; it's the potential for later monopolistic pricing that the law polices.  *See id.* at 323–24.  The farmers complain about Nucor's "exorbitant" bid, but they never take the next step of explaining how its one-time purchase of a non-fungible good might enhance its monopoly power.  Indeed, we question whether the farmers could have made such a showing given that they and Nucor operate in different output markets.  *See, e.g.*, *Province v. Cleveland Press Publ'g Co.*, 787 F.2d 1047, 1052 (6th Cir. 1986) (holding that former employees lacked standing to sue newspaper for reducing competition in the newspaper market in part because they were "not consumers or competitors" in the market); *Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178, 184 (3d Cir. 1997) (Alito, J.) ("Because [plaintiff] was thus not a competitor or a consumer in the market in which trade was allegedly restrained by the antitrust violations . . . [it] lacked standing to institute this [antitrust] action.").

The farmers try to convert this second weakness into a strength, arguing that Nucor's conduct was particularly flagrant *because* they are not competitors.  Had Nucor leveraged "lower prices, better products, or more efficient services in the grain market," the farmers surmise that its

-8-

No. 21-5989, *Fackler v. Greenland Acquisition Co.*

conduct might have been acceptable.  The implications of this argument are astounding:  Taken seriously, the farmers' position would mean that no industry other than grain processing could occupy that portion of the Riverport.  Not surprisingly, the farmers cite no authority for their once-a-grain-elevator-always-a-grain-elevator principle.  As far as we know, there isn't one.  *Cf. Olson v. United States*, 292 U.S. 246, 255 (1934) (holding that the fair market value of property "does not depend on the uses to which [the current owner] has devoted his land but is to be arrived at upon just consideration of all the uses to which it is suitable").

Finally, the farmers' brief at times seems to suggest that Nucor's "predatory" behavior gives rise to an inference of nefarious intent.  For example, they describe Nucor's conduct as "paying an exorbitant sum to shut down the market."  If Nucor had indeed offered to pay extravagantly more than it could reasonably expect to recoup in steel sales, *see Weyerhaeuser*, 549 U.S. at 325, then such irrational behavior might suggest that Nucor wanted to do something other than just purchase a valuable piece of property.  That motive could, perhaps, support the conclusion that Nucor's interference was improper.  *See* Restatement (Second) of Torts § 768 cmt. g ("[I]f [the actor's] conduct is directed solely to the satisfaction of his spite or ill will and not at all to the advancement of his competitive interests over the person harmed, his interference is held to be improper.").  But again, the complaint makes no allegations that Nucor's bid was economically irrational.

The district court properly held that the farmers failed to state a claim for tortious interference on the overpayment theory.

2.

Alternatively, the farmers' appellate briefing maintains that Nucor improperly induced local officials to fix the vote of the Riverport Authority.  But the farmers' assertions on appeal find

-9-

No. 21-5989, *Fackler v. Greenland Acquisition Co.*

no support in their complaint. The appeal briefs claim, for example, that Nucor "coerce[d]" local officials into executing the member-replacement scheme, but the complaint alleges that "the Fiscal Court and Development Authority conceived" of that plot, not Nucor. And while the complaint alleges that Nucor "urg[ed]" officials to come up with a plan to terminate the lease by October 1, it does not say, nor can we reasonably infer from the allegations in the complaint, that the company pressured officials to do anything illegal.[3]

The farmers argue that it is enough that Nucor "was aware of and approved" the plan. And they're right that "[t]here is no technical requirement as to the kind of conduct that may result in interference." Restatement (Second) of Torts § 766 cmt. k.; *see id.* § 766B cmt. e. But the farmers' theory goes a step too far: If approval of another's interference alone sufficed, then there need not be any "conduct" at all. *Contra Hornung*, 754 S.W.2d at 859 ("[T]o prevail a party seeking recovery must show malice or some significantly wrongful conduct."). A rule prohibiting interference would be mutated into a duty to prevent others from interfering. The farmers offer no authority for that position. The dearth of precedent shouldn't be surprising; the common law has long recognized that inaction usually cannot create tort liability, *James v. Wilson*, 95 S.W.3d 875, 889–90 (Ky. Ct. App. 2002); Restatement (Second) of Torts § 314.

In concluding that the complaint alleges more than just "awareness and approval," the dissent relies on a footnote in Nucor's appellate brief that rephrases the farmers' complaint. Dissent Op. at 18 (quoting Appellee Br. at 21 n.11). But according to the complaint, the Fiscal Court—not Nucor—"plot[ted] to stack the Riverport Authority" with stooges; and Nucor's

---

[3] For that reason, we fail to see why it would matter that Nucor allegedly gave "formal sanction to" the officials' plan. Dissent Op. at 18. Nucor allegedly sanctioned a plan to secure a favorable vote, not to break the law in the process.

No. 21-5989, *Fackler v. Greenland Acquisition Co.*

insistence on the October 1 deadline caused "the Fiscal Court and Development Authority"—again, not Nucor—to "conceive[]" of that plot.  The district court properly dismissed this claim.[4]

## B.

The farmers also appeal the dismissal of their claim for civil conspiracy.  What the parties call "civil conspiracy," is, under Kentucky law, actually two distinct means of recovering from multiple defendants for an underlying tort.  The first is conspiracy, which requires the plaintiff to show that the defendant agreed with another to do an unlawful act and that the plaintiff's damages resulted from an overt act done in furtherance of the conspiracy.  *James*, 95 S.W.3d at 897.  The second is aiding and abetting, which requires the plaintiff show that the defendant knowingly gave substantial assistance or encouragement to another's commission of a tort.  *Miles Farm Supply, LLC v. Helena Chem. Co.*, 595 F.3d 663, 666 (6th Cir. 2010) (applying Kentucky law).  *See also Farmer v. City of Newport*, 748 S.W.2d 162, 164 (Ky. Ct. App. 1988) (adopting Restatement (Second) of Torts § 876, which groups both theories under the label "concert of action").

The two theories have some elements in common, however.  Both depend on some underlying tortious conduct.  *See James*, 95 S.W.3d at 897 (conspiracy); *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 485 (Ky. 1991) (aiding and abetting).  And both require a culpable mental state.  Specifically, because co-conspirators must agree to commit "an unlawful act," *James*, 95 S.W.3d at 897, Kentucky courts have recognized that conspiracy liability requires "specific intent."  *Cath. Health Initiatives, Inc. v. Wells*, No. 2016-CA-001919-MR, 2018 WL

---

[4] The dissent concludes that the district court erred by dismissing the complaint for failure to state a claim but neglects the portion of Nucor's brief arguing that it is immune from liability under the *Noerr–Pennington* doctrine.  This pure question of law was raised below and fully briefed by both parties on appeal.  And if Nucor's defense is valid, then, of course, it cannot be liable.  The dissent offers no reason for bypassing this potentially dispositive question.

No. 21-5989, *Fackler v. Greenland Acquisition Co.*

3798562, at *5 (Ky. Ct. App. 2018) (unpublished).  In other words, one cannot negligently join a conspiracy, *id.*; rather, he must know of and intend to further the conspiracy's tortious objective, *see Peoples Bank of N. Ky., Inc. v. Crow Chizek & Co.*, 277 S.W.3d 255, 261 (Ky. Ct. App. 2008) (affirming dismissal of conspiracy claim where there was no evidence that the defendants "were active, knowing participants" in the underlying fraud).  The Restatement, we note, shares that view:  A co-conspirator must agree "to a common design or plan for cooperation in a tortious line of conduct or to accomplish a tortious end."  Restatement (Second) of Torts § 876 cmt. b.  So do prominent commentators.  *See, e.g.*, W. Page Keeton et al., *Prosser and Keeton on The Law of Torts* § 46 (5th ed. 1984) ("It is . . . essential that each particular defendant . . . shall be proceeding tortiously, which is to say with the intent requisite to committing a tort."); Dan B. Dobbs, et al., *Dobbs' Law of Torts* § 435, Westlaw (database updated June 2021) (noting conspirators must agree "to pursue a common illegal design").  Likewise, aiding-and-abetting liability arises only if the defendant knew it was assisting or encouraging tortious conduct.  *See Miles Farm Supply*, 595 F.3d at 666; *Steelvest*, 807 S.W.2d at 485; Restatement (Second) of Torts § 876 cmt. d (liability arises only "if the act encouraged is known to be tortious").

The parties dispute whether the actions of the Fiscal Court and Development Authority constitute a tort on which the farmers' conspiracy and aiding-and-abetting theories can stand.  But we need not reach that issue because both theories fail for a different reason:  The farmers have not alleged that Nucor had the requisite state of mind.  They have neither alleged that Nucor agreed to "cooperat[e] in a tortious line of conduct or to accomplish a tortious end," nor that Nucor aided and abetted an act "known to be tortious."  Restatement (Second) of Torts § 876 cmt. b, d.  Under either theory, Nucor did not allegedly know of the critical facts rendering the officials' actions tortious.

No. 21-5989, *Fackler v. Greenland Acquisition Co.*

The farmers contend that the Fiscal Court and Development Authority officials tortiously interfered with their expected grain sales through the scheme to rig the Riverport Authority vote—from replacing dissenting members with yes-men, to publishing a deliberately vague meeting agenda, to voting without a quorum.  What makes the interference improper, the farmers say, is that those actions violated Kentucky law.  *See* Restatement (Second) of Torts § 767 cmt. c.  But they violated the law only if the dissenting members' terms had not expired, the agenda was too terse, and the vote was quorum-less.  Those key facts separate the illegal from the innocuous.  For Nucor to be liable on a conspiracy or aiding-and-abetting theory, then, it had to know of those circumstances.  While Nucor allegedly knew about "the plan" to replace the dissenting members, the complaint stops short of asserting that Nucor knew of these critical details.  Nor are there any allegations from which we could infer such knowledge.  To the contrary, the complaint asserts that the government officials, not Nucor, "conceived" of the scheme, and the critical facts allegedly came to bear at a Fiscal Court meeting at which Nucor was not present.[5]

The dissent highlights the complaint's allegation that Nucor "knew and understood" that the Riverport Authority's vote "was obtained through improper, unjustified, and unlawful acts." Dissent Op. at 19 (quoting R. 1, PageID 8).  As the verb tense shows, and as the context of the complaint reveals, these allegations concern Nucor's knowledge *after* the scheme had played out.  But to be liable Nucor would have had to know—when it joined the conspiracy or provided substantial encouragement—that the local officials' conduct was tortious.  *See Cath. Health*,

---

[5] In their appellate brief, the farmers argue for the first time that Nucor's execution of the lease termination agreement in December 2019—when it *did* allegedly know that the termination "was obtained through improper, unjustified, and unlawful acts"—constituted substantial assistance in the public officials' tortious interference.  This argument is forfeited because the farmers failed to raise it before the district court.  *United States ex rel. Maur v. Hage-Korban*, 981 F.3d 516, 522 (6th Cir. 2020).

-13-

No. 21-5989, *Fackler v. Greenland Acquisition Co.*

2018 WL 3798562, at *5 (reversing denial of directed verdict on civil conspiracy claim where there was no evidence of the unlawful act that the defendants "agreed upon"); *cf. Rosemond v. United States*, 572 U.S. 65, 78 (2014) (explaining that courts can infer a defendant's intent to aid and abet a crime from his "advance knowledge" of the relevant facts). The complaint makes no such allegation. Without knowing, in advance, the facts that made the officials' conduct tortious, Nucor cannot be liable.

\* \* \*

The plight of the Meade County farmers is not lost on us. If the alleged facts are true, they lost out both because of legitimate economic competition and corrupt local politics. The law's encouragement of the former does not excuse the latter. But even if the Fiscal Court and Development Authority engaged in the chicanery the farmers have alleged, the defendant in this case is Nucor. And the complaint does not sufficiently allege either that Nucor itself tortiously interfered with the farmers' contracts, or that it conspired with or aided the local officials in doing so.

We AFFIRM.

-14-

No. 21-5989, *Fackler v. Greenland Acquisition Co.*

CLAY, Circuit Judge, dissenting.   Concocting a plan to illegally oust sitting local government officials, replace them with puppets, hold illegal government meetings, and illegally vote on issues of public importance is plainly improper as that term is used in the Restatement (Second) of Torts § 767.   Because the complaint alleges that Defendants took part in just such a scheme, the district court erred in dismissing Plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(6).   Therefore, I respectfully dissent.

Plaintiffs, local grain farmers around Brandenburg, Kentucky, grew and sold grain to Consolidated Grain & Barge Co. ("CGB") which operated a grain silo on land that it leased from three local government entities:   the Meade County Riverport Authority ("Riverport Authority"), the Meade County Fiscal Court ("Fiscal Court"), and the Meade County – Brandenburg Industrial Development Authority ("Development Authority") (collectively, the "Local Entities"). Defendants Greenland Acquisition Co. and Nucor Corporation (collectively, "Nucor") wanted to pay CGB to end its lease so that Nucor could use the land to build a steel factory.   Some of the Local Entities thought this was a good idea, but the Riverport Authority worried about the effect on local grain farmers.

Because the Riverport Authority had the power to hold up the entire deal, Nucor worked with the Fiscal Court and the Development Authority to concoct a plan to prematurely terminate CGB's lease on the Riverport property.   "[N]ucor pressured the Fiscal Court and Development Authority to make the Riverport Authority sign the lease Termination Agreement by October 1[, 2019]."   (Compl., R. 1, Page ID #6.)   "In an email of September 27[, 2019], Nucor representative Johnny Jacobs told the county officials that Nucor needed 'results' and stressed that the Lease Termination Agreement must be 'fully resolved by end of day Tuesday [October 1] at latest."   (*Id.*) That gave the Fiscal Court and the Development Authority only one week to get the Riverport

No. 21-5989, *Fackler v. Greenland Acquisition Co.*

Authority on board with kicking CGB out and leasing the land to Nucor.  "[B]ecuase of Nucor's urging, the Fiscal Court and Development Authority conceived of a plot to remove two of the objecting Riverport Authority members."  (*Id.*)  "Nucor was aware of and approved the plan to replace" those two officials with members that were "pre-selected to vote in favor of the Lease Termination Agreement."  (*Id.*)  The complaint further alleged that this replacement "was blatantly illegal" because the incumbent members' terms had not expired.  (*Id.* at Page ID #7.)

In summary, Plaintiffs alleged that "[a]t Nucor's behest, the Fiscal Court plot[ed] to stack the Riverport Authority with political favorites in order to terminate the Lease."  (*Id.* at Page ID #8.)  The complaint also alleged that Nucor approved other "improper, unjustified, and unlawful acts," including violations of Kentucky's Open Meetings Act and an illegal vote to terminate the Lease and sell the land to Nucor.  (*Id.*)  Plaintiffs sued Defendants for intentional interference with a prospective contractual agreement and civil conspiracy under Kentucky law.  Nucor then moved to dismiss the case for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  The district court granted Nucor's motion and dismissed the suit.

To survive a motion to dismiss on a claim for intentional interference with prospective contractual relations under Kentucky law, a plaintiff must allege facts showing (or allowing one to reasonably infer) that the defendant intentionally and improperly interfered with the plaintiff's prospective contractual relations.  *Harrodsburg Indus. Warehousing, Inc. v. MIGS, LLC*, 182 S.W.3d 529, 534 (Ky. Ct. App. 2005) (quoting Restatement (Second) of Torts § 766B (1979)).  In a nutshell, the issue in this case is whether Nucor acted improperly.  Kentucky turns to § 767 of the Restatement when deciding whether the defendant's conduct was improper.  *NCAA ex rel. Bellarmine Coll. v. Hornung*, 754 S.W.2d 855, 857 (Ky. 1988).  The Restatement lists several factors to consider, including the defendant's motive and the nature of the conduct.  *See*

-16-

No. 21-5989, *Fackler v. Greenland Acquisition Co.*

Restatement (Second) of Torts § 767.  Under Kentucky law, "a party seeking recovery must show malice *or* some significantly wrongful conduct." *Hornung*, 754 S.W. 2d at 859 (emphasis added). "[W]hen there is room for different views, the determination of whether the interference was improper or not is ordinarily left to the jury, to obtain its common feel for the state of community mores and for the manner in which they would operate upon the facts in question." Restatement (Second) of Torts § 767 cmt. l.  Thus, the impropriety analysis is based on fact intensive inquiries concerning community values and morals.  Therefore, courts must not insert their own notions of right and wrong to make sweeping legal conclusions in this context.

Applying these standards, the complaint alleges facts that would allow a factfinder to conclude that Nucor engaged in "some significantly wrongful conduct." *Hornung*, 754 S.W.2d at 859.  Everyone involved, including the majority and Nucor, agrees that taking part in a scheme of government corruption amounts to significantly wrongful conduct.  Thus, there is no question that the complaint alleges that the Fiscal Court and the Development Authority engaged in wrongful conduct.  But the majority says that the complaint makes no such allegations specifically against Nucor.  This conclusion flies in the face of well established pleading rules whereby courts "must accept the factual allegations in the complaint as true and construe the complaint in the light most favorable to the plaintiff." *Lipman v. Budish*, 974 F.3d 726, 740 (6th Cir. 2020) (citing *Hill v. Blue Cross & Blue Shield of Mich.*, 409 F.3d 710, 716 (6th Cir. 2005)).

The majority's analysis is flawed for two reasons.  First, it concludes, without any support, that a defendant cannot be liable merely because he was "was aware of and approved" of another's wrongful conduct (here, corrupt local government activity).  The majority admits, as it must, that Nucor "knew and understood" that the Local Entities were using "improper, unjustified, and unlawful acts" to get Nucor what it wanted.  Yet it confusingly suggests that that "awareness" and

-17-

No. 21-5989, *Fackler v. Greenland Acquisition Co.*

"approval" are not "conduct" at all, and Nucor cannot be liable for something it did not do.  But by approving the Fiscal Court and the Development Authority's corrupt plan, Nucor gave "formal sanction to" the illegal conduct.  *Approve*, Black's Law Dictionary (11th ed. 2019).  That is a far cry from the majority's implausible theory that Nucor simply turned a blind eye.  Perhaps in the majority's eyes formally sanctioning and incentivizing allegedly corrupt and illegal government activity is not "significantly wrongful conduct," but I would beg to differ.  This is precisely why the issue of impropriety is "ordinarily left to the jury, to obtain its common feel for the state of community mores."  Restatement (Second) of Torts § 767 cmt. l.

That brings us to the majority's second error.  The complaint makes several more specific allegations about Nucor's wrongful conduct beyond mere awareness and approval.  As the majority admits, Plaintiffs' claims must survive if one could "reasonably infer from the allegations in the complaint[] that [Nucor] pressured officials to do anything illegal."  (Majority Opn. at 10.)  Nucor's own description of certain facts shows that it did, in fact, pressure officials to engage in illegal and corrupt conduct:

> [T]he Complaint alleges . . . that Nucor "*plot[ed]* to stack the Riverport Authority with political favorites in order to terminate the Lease," and *urged government officials* to "conceive[] a plot to remove" [two of the existing members] from the Riverport Authority.

(Def. Br. at 21 n. 11 (quoting Compl., R. 1, Page ID #6–8) (emphasis added).)  Plotting to stack the deck by pressuring the Local Entities to remove two government officials and appoint puppets to replace them screams of wrongfulness and impropriety.  *See* Restatement (Second) of Torts § 768 cmt. c ("Conduct . . . contrary to established public policy may for that reason make an interference improper.").  And, contrary to the majority's assertion, the complaint makes clear that Nucor was in on the plan *before* the allegedly illegal conduct transpired.  "On the afternoon of October 1," *before* the illegal meeting and vote, "Nucor had a phone call with leaders of the Fiscal

-18-

No. 21-5989, *Fackler v. Greenland Acquisition Co.*

Court and Development Authority in which . . . they discussed the plan to secure the vote that night."[1]   (Compl., R. 1, Page ID #6.)   At the very least, Nucor urged the Local Entities to do whatever they had to do, using any means necessary, to terminate the lease in a short period of time despite a mountain of regulatory red tape standing in the way.   Therefore, the district court erred in dismissing Plaintiffs' intentional interference claim on this basis.

The majority attempts to explain away these allegations by concluding that "Nucor did not allegedly know of the critical facts rendering the officials' actions tortious."   (Majority Opn. at 12.)   But the complaint specifically alleges that Nucor was aware of each allegedly wrongful act including plotting to stack the Riverport Authority, calling an illegal special meeting, and terminating the Lease without the quorum required to do so.   That suffices at the motion to dismiss stage.   Indeed, had this case proceeded to discovery, it seems likely that Plaintiffs could have, and perhaps likely would have, unearthed troves of evidence outlining the extent of Nucor's participation and knowledge in the alleged corruption.

These same allegations also support Plaintiffs' civil conspiracy claim.   To survive a Rule 12(b)(6) motion on this claim, Plaintiffs must plausibly allege facts showing (or allowing one to infer) that the defendant joined "a corrupt or unlawful combination or agreement between two or more persons to do by concert of action an unlawful act," *James v. Wilson*, 95 S.W.3d 875, 897 (Ky. Ct. App. 2002) (quoting *Smith v. Bd. of Educ. of Ludlow*, 94 S.W.2d 321, 325 (Ky. 1936)), or that the defendant substantially assisted or encouraged another's commission of a tort, *Miles*

---

[1] The majority buys into a forgiving narrative that paints Nucor as an oblivious bystander.   Given that the factual assertions in the complaint directly contradict that narrative, the majority goes out of its way to view the facts in Nucor's favor.   For example, the majority ignores the allegations concerning this October 1 phone call and relies on "verb tense" and "the context of the complaint" to conclude that Nucor only learned of the wrongfulness of the scheme after the fact.   In doing so, the majority blatantly disregards well settled principles governing motions to dismiss.   *See Lipman*, 974 F.3d at 740 (citing *Hill*, 409 F.3d at 716).

No. 21-5989, *Fackler v. Greenland Acquisition Co.*

*Farm Supply, LLC v. Helena Chem. Co.*, 595 F.3d 663, 666 (6th Cir. 2010) (applying Kentucky law). The complaint states that Nucor had specific knowledge about "improper, unjustified, and unlawful" acts including "plotting to stack the Riverport Authority with political favorites," "calling an illegal special meeting in violation of the Open Meetings Act," "replac[ing] Riverport Authority members whose terms had not expired . . . with no rational or lawful basis," and "authoriz[ing] the Lease Termination Agreement without a lawful quorum." (Compl., R. 1, Page ID #8.) Indeed, the complaint alleges that the Local Entities engaged in these wrongful actions "[a]t Nucor's behest." (*Id.*) Plaintiffs have thus sufficiently alleged facts to support their civil conspiracy claim.

      For these reasons, I would reverse the district court's order granting Defendants' motion to dismiss for failure to state a claim.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 21-5989

LARRY FACKLER, EDWARD HOBBS, and STEPHEN
HAGER, on behalf of themselves and all others similarly
situated,

      Plaintiffs - Appellants,

      v.

GREENLAND ACQUISITION COMPANY, INC.;
NUCOR CORPORATION,

      Defendants - Appellees.

> **FILED**
> Jun 28, 2022
> DEBORAH S. HUNT, Clerk

Before:  BATCHELDER, CLAY, and LARSEN, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Western District of Kentucky at Louisville.

THIS CAUSE was heard on the record from the district court and was submitted on the briefs without oral argument.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED.

**ENTERED BY ORDER OF THE COURT**

_____
Deborah S. Hunt, Clerk